Case 20-1875, Onyx Therapeutics v. CIPLA Limited Mr. Walia, whenever you're ready. Good morning, Your Honors. My name is Gurpreet Singh Walia from the law firm Fisher Broads representing CIPLA USA and CIPLA Limited. The 112 patent claim number 31 to an ARCIS formulation Mr. Judge Proce, could you speak up just a little? I'm sorry, Your Honor. The 112 patent claim number 31 to an ARCIS formulation of carfilzomib is invalid for obvious misdouble patenting. The earlier claim of the 125 patent provided for an ARCIS formulation of carfilzomib. The district court found that the only patentable distinction in claim number 31 of the 112 patent over the ARCIS formulation of the earlier patent was number one, the specification of a pH of 3.5 and number two, the 10 millimole concentration of citric acid that achieves that pH. The pH of 3.5 is the pH that is necessary to make carfilzomib water-soluble. Mr. Walia. Yes, Your Honor. Thank you. In the blue brief at 55 to 57, you argue that formulating carfilzomib at a pH of 3.5 was obvious because, quote, optimization of pH ranges is routine, is within the range of what the prior ARC taught was acceptable for intravenous injection. Where do you make that argument in the record below? Your Honor, it was in the record below. I can try and find that in a minute. But we did cite extensively to the Henderson-Hasselbalch equation and we used it for the premise that it was a known prior ARC. The Henderson-Hasselbalch equation was known prior ARC and that the use of it was routine. The Henderson-Hasselbalch equation has been routinely taught to pharmacy students and it is well known in the ARC. Mr. Walia. Yes, sir. In the gray brief at 13, you argue that the Henderson-Hasselbalch equation allows a person of skill, quote, to see that a pH of 3.5 provides 97% protonation. Sorry, Dr. Amici's testimony at JA4468. But at 4468, counsel asked Dr. Amici whether a person of skill in the ARC would, quote, continue to use pHs below 3 if they were formulating carfilzomib, to which Dr. Amici responded, no, not in my opinion, because you are already getting 97% ionization. Why didn't we get that complete citation? I believe it was in the appendix, Your Honor, but we do refer to it numerous times in the brief submitted to Your Honor, and it is actually a fact that at 97, at 3.5 pH, 97% of carfilzomib will be solubilized, will be protonated, which will lead to 97% solubilization, and that has been referred to extensively in our briefs. What he mentioned, what Dr. Amici mentioned about the rule of thumb about being two, that was just a red herring. He did mention that the Henderson-Hasselbalch equation has been used extensively, and a person of skill in the ARC would use the Henderson-Hasselbalch equation to go below the pKa to find the optimization pH for the solubility. The problem of the prior ARC was solubility, the YU-101, which was the closest compound to it. You argue in the blue brief at 14 that Dr. Radjuski's testimony that an acid pH below 7 would degrade the warhead, you say, quote, was in fact wrong, because, quote, routine testing could easily establish that the warhead does not degrade at 3.5 pH. Where is that fact that it doesn't degrade at 3.5 pH found in the record? Your Honor, it was never disputed. The latest expert claimed that it would disintegrate the epoxy ketone warhead, but it was never approved. The formulation used is 3.5 pH, and that's below the pKa, and it does not degrade at that point. May I continue, Your Honor? Yes. So the pH of 3.5 is the pH that is necessary to make carfilzomib water soluble so that it can be made into an aqueous formulation, and the citric acid concentration of 10 millimoles, if that's needed. Let me just be, I'm sorry, this is Judge Prowse, but, I mean, there are several different claims here. We've got the compound claims and the formulation claims. So the argument, just so I'll be clear, there are a lot of issues in this case. The argument you're making on obviousness double patenting goes only to the formulation claim. Yes, Your Honor. I'd like to address also the compound patents. Sure. The selection of bortezomib was a legal error because there was nothing in the prior art which showed how to improve it. It had very serious toxicity problems. The elite compound is one that a person of ordinary skill would select as most promising to modify in order to improve upon its activity and obtain a compound with better activity. And the hypothetical person of ordinary skill in the art is not an inventor. He does not seek to innovate. He just follows conventional wisdom. He knows all the prior art. Mr. Wallia, I take your points, and we've all read your briefs. It seems to me that the real hurdle you have in this case is you have a very detailed district court opinion based on a bench trial where he made numerous, numerous findings of fact. Now, maybe a reasonable person could have gone the other way too, but that's not sufficient to establish clear error on the part of the district court. On this point, for instance, he rejected that POSA would know how to improve YU-101, and he also rejected that the only problem with YU-101 was solubility. And to be just completely up front with you, I have a hard time seeing how we can dislodge those findings based on his review of the record. Well, he disregarded YU-101 as a lead compound because he said it's an irreversible inhibitor. But irreversible inhibitors were in the prior art, and the compound patterns ensued do mention, they refer to voxamycin, which was in the prior art, as use. They depend on that as use for anti-cancer treatment. So he also disregarded YU-101 as being toxic. But toxicity is not part of the claims. It's not part of the claimed invention here. So because of that reason, YU-101 should have been at least one compound to have been selected as a lead compound. And it was well known in the prior art. There was no evidence in the prior art of the bortezomib which he selected that there was nothing in the prior art to show that it could be improved. So a personal organist in the art would not choose a compound which he could not improve. He's not an inventor. So he had to have a starting point. And a starting point, the most promising starting point was YU-101. It was well known in the art. It was in vitro studies showing that it was useful for cancer. It was the most potent. It was the most specific compound at the protease inhibitors, as a protease inhibitor. And the problem of the solubility was the way to – it had a problem with solubility. And the way to overcome the solubility problem was known in the art of using morpholine. And morpholine, the district court below accepted as a fact that morpholine is a weak base which can be used to help solubility. It's known in the prior art in the CPC handbook. And using morpholine was just an obvious way of increasing its solubility. And that's the reason why attaching it again to the N-terminus was the most obvious place to put it because that was the only place which was not active in its function. The epoxy ketone warhead and the side chains were hydrophobic and they were necessary for its binding to the proteasome. So, therefore, N-terminus being the only logical place to attach this and using morpholino as one of the obvious choices of improving solubility would be the way for a person of any skill to use it. Okay. Why don't we reserve the remainder of your rebuttal and hear from Mr. Coombridge. Thank you. Thank you. Thank you, Chief Judge. This is Nicholas Coombridge on behalf of ONIX. And I'd like to just take up with the lead compound issue here. So, in our view, it is exactly as Your Honor stated that there are extensive fact findings all amply supported by the evidence. And the court would have to find clear error, we believe, as to five separate factual issues in order to find structural obviousness here. Those are the selection of the lead compound, the motivation to modify and specifically where to modify it, the N-terminus, and what to modify it with a morpholino group, whether there would be any reasonable expectation of success, that all of those things are factual questions that were extensively addressed below and resolved by the district court, and there's no clear error in that. So, with respect to the selection of YU-101, the district court noted the facts, the positive attributes that Mr. Willier mentioned, that it was more potent and that it was specific for the so-called CTL sites, but then went on to address all of the shortcomings that YU-101 had. It was not drug-like. It was not well-studied. There was almost no data on its solubility or bioavailability or stability, that even though it had high specificity for the CTL site, that did not necessarily equate to specificity for the proteasome. In other words, there could very easily be off-tissue targeting where it bound to the CTL site in other undesired places. Of course, that it was irreversible and that there was a strong industry prejudice against irreversible molecules. And, of course, also low solubility, but low solubility was by no means the only shortcoming, and the district court made a point of rejecting that argument, which is repeated here throughout the blue brief, and said, no, when you view all this on balance, looking at this through the eyes of the person of ordinary skill, then that person would not have selected YU-101, and it was not only more likely, it was far more likely that the person of ordinary skill would have selected bortezomib. And, in addition, even apart from bortezomib, there were at least three other candidates that would be ahead of YU-101 on the list. So, in our view, there's simply no clear error in that. There's ample evidence, and it's correct that YU-101 would not be a lead, that the people who made this invention, proteolics, were, as the district court pointed out, idiosyncratically motivated because one of their founders was the developer of YU-101, and they had a license to that compound. But when you look at the, you survey the art, and the knowledge of the person of ordinary skill, you would not have picked YU-101. Even if you did pick it, you would then need to decide how to modify it. And, again, there's a factual finding that the N-terminus would not have necessarily have been the logical place. There's evidence in the record that it was known in the art that modifications at the N-terminus could decrease potency by 90% or perhaps as much as a factor of 30, and that if potency was the reason for picking YU-101 in the first place, then you wouldn't want to make a modification that would severely compromise its potency. And these are all fact findings by the district court based on some evidence presented to him, correct? Exactly, Your Honor. There's some evidence, but these were central disputed issues that were the focal point of the bench trial. Mr. Brugge, before your time runs out, your friend started with the formulation claim and the obviousness double patenting. And doesn't it strike you a little strange that pH is enough for patentability here? Your Honor, I don't... You've got the 125, and pH for that claim would be limited to the 3-5 pH range, right? No, Your Honor. The reference claim in the 125 patent is completely silent about pH. It simply doesn't mention it. But it's a claim of pharmaceutical composition, so what would the pH for that claim possibly be? Well, it's unstated, and there was evidence that for injectable pharmaceuticals, they can fall in the range 2-12, which is, of course, a huge part of the potential range of 0-14. And so there's a very wide range. And once again, and I'm happy to go into this, Your Honor, and also picking up on some of Judge Wallach's questions, in the trial court, the argument in support of obviousness type double patenting was based on this purported rule of sum that someone would formulate picking a pH that was approximately 2 pH units below the so-called pKa value. And the district court rejected that, making credibility determinations, and said, I simply didn't accept that such a rule of sum existed. On appeal, the argument has now been retooled to rely on the so-called Henderson-Hesselbach equation. And as far as I understand the argument, it is to the effect of, well, if you know the pKa, then you can determine that at a pH of 3.5, 97% of the species would be protonated and therefore soluble. Again, one of the flaws, the first flaw in that is that the district court made a fact finding that the person of ordinary skill would not know the pKa value for carfilzomib. It was not known in the prior art. The skilled person wouldn't be able to calculate it and would have found it very difficult to measure precisely because carfilzomib is such an unstable molecule. And so if you don't have the pKa value, then the supposed teaching to go to a pH value in the range of 3 or 3.5 just disappears. And there was testimony that was credited by the district court that the warhead here, the part that's going to bind and have the biological effect, is an extremely unstable structure. It's depicted as a kind of triangular moiety and the chemical bonds are very tightly constrained and also because oxygen is involved there, it's vulnerable to hydrolysis. And that a skilled person would have strongly believed that this warhead would be unstable in an acidic environment and would have avoided using a pH on the acid side. And of course, 3.5 is quite acidic. The midpoint is 7. And so the skilled person would have tried to formulate in some other way and the district court made an explicit fact finding, it's fact finding number 176, that the person of ordinary skill would have known that there were numerous other solubilization techniques. So, you know, I think we need to be careful to avoid falling into the hindsight trap that pH is the only way to address solubility. It's not. And even in the reference claim, solubility is addressed by the presence of the cyclodextrin and therefore we would submit that it's perfectly plausible reading that if a skilled person were presented with the reference claim, that person would conclude that solubility had been addressed not through pH, but through the use of the cyclodextrin whose sole purpose is to promote solubility. And so we think, again, the district court was abundantly correct. There's certainly no clear error in finding that the skilled person would have been concerned about going to a low pH, would have looked for a pH probably in the range 7 to 11 or certainly above 5, and would have used other tools in the toolbox to try to formulate this product. And so there really is no obviousness type double patenting. And just to wrap up on that, the way we would look at it, we don't see it as being just about pH. We think that the district court correctly found that what's going on here is a formulation taken as a whole and that there are various things working together to make this difficult-to-formulate molecule actually usable in a pharmaceutical context. And that would include the cyclodextrin. It would include the selection of the citric acid and so on. And we can't be in a place just by saying, well, if some of the elements of the claim were known, therefore the claim taken as a whole must be obvious. And the district court, in our view, applied that very long-standing principle correctly to say it's not obvious. And so I guess with that, I would pause and see if there are any other areas as to which the court has questions. I can certainly go on and address other issues, but I don't want to simply be speaking for the sake of it. Hearing none, I think we have your argument, Mr. Groombridge. Thank you. Great. Thank you. Mr. Walia, you've got some time left on rebuttal, please. Yes, Your Honor. Can you hear? Your Honor, first of all, regarding bortezomib, it was a legal error because there was nothing in the prior act to guide a person of ordinary skill to select bortezomib. There was no way to improve it in the prior act, and therefore selection of bortezomib was wrong. Selection of YU-101 was the right selection for a lead compound because of its non-in vivo in vitro properties and because it was the most specific and most potent known in the prior act. The fact that it was rejected by the court below was a legal error. It was rejected because it was an irreversible binder. In the patent suit, the suits themselves admit there is no data of in vivo function of the compound patents. They refer back to the prior act, a 1992 article, which gives the benefits of hypoxomycin, which is the parent compound of YU-101, and it says because that irreversible inhibitor was effective for cancer, therefore carfilzomib was effective for cancer. At best, they only talk of an enzyme inhibition test in their compound. Clearly, YU-101 should have been picked up as at least one lead compound. The insolubility problem of YU-101 was very well known in the art. The way to solve that problem was well known in the art by using a morpholino substituent at the N-terminus. This was acknowledged by the court below. The N-terminus was the best place to put it at because the hypoxic ketone warhead was used for binding. The difference between the YU-101 and carfilzomib was the difference between hypoxomycin and YU-101 was that Dr. Cruz had modified the side chains to make them more hydrophobic for attachment. Therefore, that left the N-terminus for attaching a morpholino, which was the obvious choice. Regarding the formulation pattern, the pKa is well known that to determine the pH, where the solubility of a compound is going to be, the pKa has to be determined. Once you determine the pKa, it's simply a matter of plugging into the Henderson-Hasselbalch equation to see at what percentage you get a high solubility of the aqueous solution. The second thing is citric acid is added to titrate it to that particular pH. There's no invention here. It's using the known elements for their known uses to get to this. And to use a combination, the quote below also adds by saying, well, all the three things in this combination, you're going into an anticipation argument. The obviousness just requires you to look at the prior art and see if it's being used for its intended purpose. And here, we believe it was being used for its intended purpose. And the fact that the epoxy ketone ring, there was nothing in the evidence which showed, as claimed by the plaintiffs, that the epoxy ketone ring would break apart at such a low pH. There was just a claim. There was no evidence provided that the epoxy ketone ring would break up at 3.5. So the fact that they're claiming that at 3.5 was some kind of an invention, it's not an invention. It's just using routine prior art for its usual purposes. The PKA, they claim that the PKA was difficult to calculate. Well, they never showed that it's impossible. Their expert just said the PKA was difficult to calculate of carfilzomib, but it was never shown as such during the trial. A calculation of PKA is routine, routinely taught to pharmacy students, even though if it's difficult, it does not make it impossible. And it's routinely done to get to the aqueous formulation of a compound. So these are unsupported assertions made by the plaintiffs. The range... You can finish your thought, Mr. Walia. Thank you, Your Honor. The plaintiff argues that pH of 3.5 is some kind of an invention. It is not. It's just a pH which is, number one, acceptable for injectables, and it's an optimization using the well-known Henderson-Hasselbalch equation to find at which optimum level the carfilzomib would be soluble. Okay. Thank you. Thank you, Your Honor. We thank both sides, and the case is submitted. That concludes our proceeding for this morning. Thank you all. Thank you, Your Honor. The honorable court is adjourned from day to day.